John Jairo LONDONO–RIVERA

v.

Commonwealth of VIRGINIA.

No. 3:01MC06.

United States District Court,
E.D. Virginia,
Richmond Division.

June 4, 2001.

David L. Carlson, Stephen R. Cutright, Gilliam, Carlson, Coleman & Moore, Richmond, VA, for Plaintiff.

John H. McLees, Jr., Pamela A. Rumpz, Office of the Attorney General, Richmond, VA, Giles R. Stone, Jr., Richmond Metropolitan Multi–Jurisdiction Grand Jury, Special Counsel, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

John Jairo Londono–Rivera instituted this action by filing a Petition for Writ of Prohibition and Petition for Stay of State Court Proceedings (the "Petition") in which he asks this Court to prohibit and enjoin the use in his prosecution in the Circuit Court of Henrico County (the "State Court") of evidence that was suppressed by this Court because it was seized in violation of the Fourth Amendment. The theory upon which this extraordinary relief is sought is that the use of the evidence in the state prosecution violates the guarantees of the Double Jeopardy Clause and the Due Process Clause of the Fifth Amendment. In sum, Londono–Rivera alleges present and continuing violations of federal constitutional rights by the State Court and the state prosecutors as the predicate for seeking federal relief alleged to be essential to the protection of those rights.

## BACKGROUND

Resolution of this action turns on its rather unusual facts, as measured by several related principles of law. The facts are based on testimony and court records and are necessarily recited in detail.

### A. Arrest Of Londono–Rivera And Transfer To Federal Custody By State Authorities

On October 7, 2000, John Jairo Londono–Rivera and Orlando Valencia Betancourt were arrested while aboard an Amtrak train that was stopped briefly at the train station in Henrico County, Virginia en route from Hollywood, Florida to New York, New York. The arresting officers were John O'Connor and Anthony Patterson, who, at the time, were investigating a tip about a suspicious train ticket that their supervisor, Investigator Robert Cerillo, had received from the United States Drug Enforcement Administration ("DEA"). 1/10 Tr. at 48; St. Tr. at 50. The officers searched the compartment in which Londono–Rivera and Betancourt were traveling and found approximately two kilograms of heroin. The search was asserted to have been consensual, the consent supposedly obtained in a conversation that occurred in the narrow hallway of a train that was loading and unloading passengers and that was rushed because the train was about to depart the station. The evidence at a suppression hearing held in this Court on January 10, 2001 established that conversation in which the supposed consent was given took place between Patterson, whose speech is quite difficult to understand (even in the quiet environs of a courtroom), and Londono–Rivera, whose capacity to understand English is limited. 1/10 Tr. at 139–45.

Officers O'Connor and Patterson are members of the Richmond Metropolitan Interdiction Unit (hereinafter the "Task Force"). They effected the arrest and the seizure of evidence acting in that capacity. Investigator Cerillo is the coordinator of the Task Force.

The Task Force is a formally established law enforcement coalition created in 1996 by the agreement of the chief law enforcement officials for the City of Richmond; the surrounding counties of Henrico, Chesterfield and Hanover; the City of Petersburg; the Richmond International Airport Police Department; the Virginia State Police; and the DEA. Since its inception, the Task Force has operated with the approval of, and in conjunction with, the Commonwealth's Attorney for the signatory state jurisdictions and the United States Attorney. The purpose of the Task Force "is to enhance the enforcement of the controlled substance laws as set forth in Virginia Code Section 18.2–247 et seq., as amended," but the signatories also recognize that the Task Force is mutually beneficial in enforcing the federal drug laws. Memorandum of Understanding at 3.

The Task Force is staffed entirely by officers from state law enforcement agencies and one representative from the DEA. The signatory jurisdictions pay the officers' salaries and contribute to the cost of operating the Task Force.

The Task Force is operated under the directive of the Virginia State Police and conducts its business under the rules and procedures of the Virginia State Police. All law enforcement officers assigned to the Task Force, including the DEA representative, are sworn officers of the Virginia State Police and they act in that capacity when discharging their official duties as members of the Task Force. The Task Force works at mass transit centers in the Richmond area (airport, train station, post office and bus depot) to interdict drugs entering enter the Commonwealth.

The Task Force has a long-standing (but unwritten) policy and practice of prosecuting cases in federal court whenever the weight of the drugs involved meets the weight that triggers the mandatory minimum sentences under federal law. 5/17 Tr. at 58. The Commonwealth's Attorney for Henrico County and the United States Attorney are aware of this policy. 5/17 Tr. at 92; 5/25 Tr. at 67–68, 79–80. And, with their knowledge and acquiescence, the policy has become the official practice of the Task Force.

It is also the policy to prosecute federally any arrest that is thought to be helpful in pursuing large scale drug operations. To that end, the Task Force officers can prosecute, in federal court, cases other than those triggering the federal mandatory minimum sentence.

The operational reality is that, as explained by Wade Kiser, Commonwealth's Attorney for Henrico County, the Task Force officers have been delegated the discretion of whether to prosecute charges in the federal or state forum, 5/25 Tr. at 67–68, 79–80, but the Commonwealth's Attorney and the United States Attorney have the ability in a given case to decline a prosecution instituted by the Task Force.

In this case, the quantity of heroin seized was sufficient to trigger a mandatory minimum sentence under federal law. Therefore, after Officer's O'Connor and Patterson arrested Londono–Rivera on state charges and while he was in state custody, and acting as members of the Task Force, took the evidence against Londono–Rivera to the DEA Task Force representative, Brian Bonifant, to execute a criminal complaint in the federal court. 5/25 Tr. at 20. That request, which implemented Task Force policy and practice, was made on October 7, 2000, the date on which O'Connor and Patterson arrested Londono–Rivera under state authority.

Thereupon, the DEA representative assigned to the Task Force immediately transferred Londono–Rivera from state custody to the custody of the United States Marshal. 5/25 Tr. at 61. No federal prosecutor was consulted before that transfer occurred. 5/25 Tr. at 54–55, 91–92. Londono–Rivera was held in federal custody pursuant to the state arrest warrant until October 10, 2000, when Bonifant, with approval of Assistant United States Attorney George Metcalf, swore out a federal criminal complaint against him for possession with intent to distribute heroin. The federal criminal complaint was predicated on the activities and findings of Task Force Officers O'Connor and Patterson. A federal detention hearing was held on October 10, 2000, and, as a result, Londono–Rivera was held in federal custody.

**B. The Federal Court Criminal Proceeding: *United States v. John Jairo Londono–Rivera,* 3:00cr353**

On October 18, 2000, Londono–Rivera and Betancourt were charged in a two-count Federal Indictment with conspiracy to possess with intent to distribute and to distribute, and possession with intent to distribute, in excess of one kilogram of heroin. The sections of the Indictment captioned Means and Methods and Overt Acts were heavily laden with allegations that transporting, and related conduct, of heroin were integral to the conspiracy.

Londono–Rivera filed a Motion to Suppress evidence obtained from the October 7, 2000 search, which this Court heard on January 10, 2001. Bonifant, the DEA member of the Task Force, was the prosecutor's representative at the hearing which lasted three hours and 50 minutes, and involved testimony from six witnesses, three for the prosecution (all Task Force members) and three for Londono–Rivera. For reasons set forth in detail on the

record of that date, the evidence seized from London–Rivera's train compartment and statements Londono–Rivera made were ordered suppressed on a finding that the United States had not proved by a preponderance of the evidence that Londono–Rivera had given valid consent to the search. The United States immediately indicated that it might appeal the order granting the Motion to Suppress, and, to that end, ordered an expedited copy of the transcript.

On January 11, in the offices of the Task Force, O'Connor and Patterson spoke to Cerillo about the suppression of the evidence in federal court the previous evening.[1] Russell Stone, Special Counsel to the Richmond Multijurisdiction Grand Jury, which shares office space with the Task Force, joined the conversation. Cerillo asked Stone for his legal opinion, and Stone asked the officers questions about the case. 5/17 Tr. at 33–34, 68, 70. Stone advised that legal research was necessary and promised to report later to Cerillo whether Stone thought that the Commonwealth could take the case. That day, Stone called the Attorney General's office to investigate whether there was a reason he could not prosecute Londono–Rivera and called Wade Kiser, Commonwealth's Attorney for Henrico County. 5/17 Tr. at 71–72.

On either January 11 or 12 (one or two days, respectively, after the January 10 suppression hearing), Metcalf spoke with Duncan Reid, First Assistant to the Commonwealth's Attorney of Henrico County. 1/17 Tr. at 7. Metcalf told Reid that he was concerned that Londono–Rivera might be released and might flee the jurisdiction and asked Reid if the State had charges that could arise out of the facts. 1/17 Tr. at 7. Metcalf informed Reid about the low likelihood of an appeal in federal court and

advised Reid that "[i]f they [the State] wanted to do something, they needed to do it because when [Londono–Rivera] was released, [Metcalf] was of the opinion he was going to be gone." 5/17 Tr. at 23. Metcalf also spoke with Bonifant on January 11 or 12 about Metcalf's concern that an appeal would not be authorized. 5/17 Tr. at 15. Bonifant told Metcalf that the State may be interested in prosecuting the case. 5/17 Tr. at 16. Also, on January 12, Metcalf told Londono–Rivera's counsel that the State was going to prosecute his client. 5/17 Tr. at 24.

Two to four days after the suppression hearing (i.e., January 12 to January 14), Cerillo spoke with Metcalf "to verify the[ ] facts [that O'Connor had recited to Cerillo] ... and also find out if we had any legal resourse [sic] of appeal through the federal system." 5/17 Tr. at 35. Metcalf and Cerillo discussed possible state charges. 5/17 Tr. at 34–35. Metcalf advised Cerillo that he thought a federal appeal was not an option. 5/17 Tr. at 35. Metcalf and Cerillo "argued" about whether state charges were possible; Metcalf at first believed they were not possible. Metcalf and Cerillo then pulled out the Virginia Code "and read the Code over" together. 5/17 Tr. at 36.

On January 16, 2001, Metcalf spoke to Wade Kiser to determine if the State had decided to pursue charges. By that time, Kiser had approved Stone's request that the State proceed with the charges. Metcalf and Kiser spoke about double jeopardy concerns. 5/17 Tr. at 91.

On January 17, this Court held a hearing on a motion by Londono–Rivera to review bond. At that hearing, David Carlson, Londono–Rivera's attorney, advised that arrest warrants had been issued against Londono–Rivera for state charges.

---

1. The January 10, 2001 hearing concluded at 7:45 p.m.

In explaining his actions to the Court, Metcalf told this Court:

> I'm not out here to double bank somebody, Your Honor. I'm also not going to let somebody who committed a crime of this nature walk if there is a way within the confines of the law to lawfully prosecute him. And that's what I did. I discussed it with them. I said, you know these provisions,[2] and Mr. Duncan Reid, who I spoke with first, and the Commonwealth's Attorney, we discussed it at length."

1/17 Tr. at 42.

On January 16, 2001, Metcalf sent the transcript of the January 10 hearing to Vince Gambale of the Appellate Division in the United States Attorney's Office in Alexandria. On the evening of January 17, Gambale informed Metcalf that he recommended the case not be sent to the Solicitor General for appeal, but that Metcalf could speak with James Comey, head of the United States Attorney's Richmond Office and Metcalf's supervisor, if Metcalf insisted on appealing. Later on January 17, or perhaps on January 18, Metcalf spoke with Comey. At that point, Metcalf knew that the State intended to proceed with the case against Londono–Rivera. Knowing that the State would prosecute Londono–Rivera, Metcalf concluded that "it would serve no purpose to go further with this appeal." 5/17 Tr. at 14–15. Thereupon, the United States did not appeal the order granting Londono–Rivera's Motion to Suppress, and on January 19, 2001, the United States dismissed the Federal Indictment against Londono–Rivera.

## C. The State Court Criminal Proceeding: *Commonwealth of Virginia v. John Londono*

On January 16, 2001, just after 4:00 PM, warrants for Londono–Rivera's arrest were issued by the State Court. That occurred after Stone, who had gotten approval to prosecute the case from Kiser, called Cerillo to tell him that state charges were indeed possible and had been approved. Cerillo testified that he told O'Connor to seek the warrants, and O'Connor obtained warrants on state charges. O'Connor testified that Metcalf may have told him he could seek warrants on state charges. 5/25 Tr. at 30; St. Tr. at 107. Londono–Rivera was ultimately indicted by the Multijurisdiction Grand Jury on two charges, transporting heroin into the Commonwealth with the intent to sell or distribute it, and conspiring to do so, in violation of Virginia Code Section 18.2–248.01.[3] A comparison of the dismissed Federal Indictment for conspiracy with the pending State Indictments discloses a rather significant similarity in charges. Indeed, the transporting of heroin and related conduct were charged as the means, methods and overt acts as the conduct that was central to the federal conspiracy charge, conduct that is significantly consonant with the now pending state charges.

Londono–Rivera filed a Special Plea of Former Jeopardy Pursuant to Code of Virginia Section 19.2–294 and a Motion to

---

**2.** It is not clear to which provisions Metcalf was referring. He mentioned Virginia Code Section 19.2–294 just before making that statement, but because "provisions" is plural he may have meant the transportation provision as well.

**3.** Both the warrants issued on January 16, 2001 were defective. The first was for transportation of cocaine, rather than heroin. The second was for conspiracy to distribute or possess with intent to distribute heroin, rather than conspiracy to transport it, which was the same as the now dismissed Federal charge and which could not have been prosecuted under Virginia Code Section 19.2–294. Both these charges were nol prossed. 5/17 Tr. at 74.

Dismiss. It appears that the Motion to Dismiss was based on the special plea. Virginia Code Section 19.2–294 states in part:

[I]f the same act be a violation of both a state and a federal statute a prosecution under the federal statute shall be a bar to a prosecution under the state statute.

For purposes of this section, a prosecution under a federal statute shall be deemed to be commenced with the return of an indictment by a grand jury or the filing of an information by a United States attorney.

On April 4, 2001, the State Court denied the motion, stating no reasons for the decision.

Londono–Rivera also filed a Motion to Exclude Evidence Previously Suppressed in Federal Court Upon Constitutional Bar, the Res Judicata and Collateral Estoppel Doctrines and Motion to Dismiss Based on a Sham Prosecution. On May 1, 2001, the State Court denied these motions, stating "Not the same parties." St. Tr. at 32.

Finally, Londono–Rivera filed, in the state proceeding, a motion to suppress the evidence, as illegally seized. The State Court denied the motion to suppress. At that hearing, Officer O'Connor testified to conversations he had with Londono–Rivera on the platform of the train station, in the police car on the way to the Task Force office and at the Task Force office, testimony which was not the same as given in Federal court. *Compare* 1/10 Tr. at 53–58 with St. Tr. at 73–79. O'Connor also had the opportunity to refresh his memory and reflect on questions that Carlson asked him at the first suppression hearing. St. Tr. at 106.

Londono–Rivera's trial is scheduled for June 5, 2001. The evidence which was ordered suppressed by this Court is to be used by the prosecution.

## A. The Instant Action: *Londono–Rivera v. Commonwealth of Virginia*, 3:01MC06

Before the motion to suppress was heard in the State Court, but after Londono–Rivera's motions to dismiss the state charges on collateral estoppel, res judicata and double jeopardy grounds were denied, Londono–Rivera filed this Petition for Writ of Prohibition and Petition for Stay of State Court Proceedings. Invoking 28 U.S.C. § 1651 (the "All Writs Act") and 28 U.S.C. § 2283 (the "Anti–Injunction Act"), Londono–Rivera asks this Court to issue a writ of prohibition against the prosecution of the state case and order a stay of the State's prosecution because the Commonwealth is collaterally estopped from using evidence found by this Court to have been obtained in violation of his Fourth Amendment rights; and, therefore, the continuation of the state case violates Londono–Rivera's rights under the Double Jeopardy and Due Process Clauses of the Fifth Amendment.

On May 7, 2001, the Court heard arguments and denied Londono–Rivera's petition for a writ of prohibition against the conduct of a hearing in the State Court on the suppression issue that was scheduled for hearing the next day. However, an evidentiary hearing was set for May 17, 2001. Following that hearing, another evidentiary hearing was set for May 25, 2001, and a briefing schedule was set.

## DISCUSSION

■ First, the Commonwealth argues that the Court lacks subject matter jurisdiction. This Court has federal question jurisdiction over this action because Londono–Rivera has alleged an ongoing viola-

tion of his constitutional rights.[4] The Petition does not invoke 42 U.S.C. § 1983 as its predicate, but it alleges the violation of federal constitutional rights by persons acting under color of state law. Hence, it would elevate form over substance to find that federal jurisdiction is lacking and, even if dismissed for that reason, the Petitioner would have to be given leave to amend to perfect the jurisdictional allegation.

The Commonwealth also asserted that this action is barred by the doctrine of sovereign immunity. Upon an unopposed motion by Londono–Rivera, the Circuit Court of Henrico County, Judge George F. Tidey, Attorney General Mark Early, Commonwealth's Attorney for Henrico County Wade Kiser, and Special Prosecutor Russell Stone have been substituted as defendants for the Commonwealth of Virginia, thereby mooting the Commonwealth's sovereign immunity argument.[5]

■ A federal court can enjoin the conduct of a state criminal proceeding only if the circumstances meet the requirements of both *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and the Anti–Injunction Act, 28 U.S.C. § 2283. 17 James Wm. Moore, *Moore's Federal Practice* § 122.05[1][c] (3d ed.); Erwin Cheme-

rinsky, *Federal Jurisdiction* 694, 776 (3d ed.1999); *see also Fussell v. Price,* 928 F.2d 712, 713 (5th Cir.1991) ("bankruptcy court may enjoin a state criminal proceeding only if the requisites of both *Younger v. Harris* and the Anti–Injunction Act are met" (citations omitted)). Hence, it is necessary to review the tests for relief under *Younger* and the Anti–Injunction Act, and, thereafter, to apply them to the circumstances here presented through an analysis of the collateral estoppel doctrine which is the only substantive precept upon which this case could be considered for possible injunctive relief.

## A. *Younger v. Harris*

■ In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746 (1971), John Harris was indicted in state court under the California Criminal Syndicalism Act and filed a complaint in federal district court seeking to enjoin Evelle Younger, the district attorney, from prosecuting him on the grounds that the prosecution and the Act violated his free speech and press rights. The Supreme Court held that an injunction against Younger prosecuting Harris violated "the national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special cir-

---

**4.** Londono–Rivera does not meet the requirements of the All Writs Act because a federal district court cannot issue a writ to a state court. *Middlebrooks v. Thirteenth Judicial District Circuit Court,* 323 F.2d 485 (8th Cir. 1963). However, failing to meet the requirements of the All Writs Act does not divest this Court of federal question jurisdiction.

**5.** The named defendant was originally the Commonwealth of Virginia, but the text of the Petition alleges that the constitutional violations are being committed by the State Court and subsequent pleadings demonstrate the Commonwealth's Attorney as another who is infringing the Petitioner's rights. The relief sought is against the State Court and the Commonwealth's Attorney. This substitution

of parties is in the interest of justice, for "[t]he real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading." *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Moreover, "[t]he constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the State a concomitant right to disregard the Constitution or valid federal law. The States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design." *Alden v. Maine,* 527 U.S. 706, 755, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

cumstances." *Id.* at 41, 91 S.Ct. 746. "Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts." *Id.* at 43, 91 S.Ct. 746. The Anti–Injunction Act, discussed *infra*, "graphically illustrates how few and minor have been the exceptions granted from the flat, prohibitory language of the old [1793] Act[,]" which prohibited any injunctions of state court proceedings. *Id.* In *Younger*, and in subsequent decisions, the Supreme Court outlined the essential predicates that must be shown before a federal court may enjoin a state court proceeding under the *Younger* doctrine.

### 1. Immediate And Great Irreparable Injury

First, and perhaps foremost, the petitioner must show irreparable injury that is " 'both great and immediate.' " *Id.* at 46, 91 S.Ct. 746. The cost, anxiety, and inconvenience of defending against a single criminal prosecution is not usually irreparable. In most cases, "the injury that [the petitioner] faces is solely 'that incidental to every criminal proceeding brought lawfully and in good faith.' " *Id.* at 49, 91 S.Ct. 746. "Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.* at 46, 91 S.Ct. 746. The rationale for this requirement is that "ordinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights[,]" *Kugler v. Helfant*, 421 U.S. 117, 124, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). That rationale, however, admits of exception where the allegedly offended right is of the sort guaranteed under the Double Jeopardy Clause because even having to face a second prosecution is a violation of a protected right that cannot be eliminated by a

defense to a single prosecution. *See infra* p. 21.

### 2. Bad Faith, Harassment Or Extraordinary Circumstances

The Supreme Court, in an opinion handed down the same day as *Younger*, explained that "[o]nly in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate." *Perez v. Ledesma*, 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). Thus, in addition to showing great and immediate irreparable injury, or perhaps as a way of so showing, the petitioner must show one of the following: bad faith, harassment or other extraordinary circumstances.

#### a. Bad Faith/Harassment

■ Bad faith or harassment suggests a prosecution brought with no expectation of obtaining a valid conviction, which can be evidenced, for example, by multiple prosecutions that do not lead to convictions. As an example of a bad faith and harassing prosecution, *Younger* cites *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In *Dombrowski*, civil rights activists were arrested and their offices raided and files seized under the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. A state judge quashed the arrest warrants for lack of probable cause and granted a motion to suppress, but state officials continued to threaten prosecution. A three-judge panel issued a temporary restraining order (TRO) against prosecutions, but the TRO was dissolved after a hearing. A grand jury returned additional indictments.

While "[i]t is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings[,]" *id.* at 484–85, 85 S.Ct. 1116, on the facts in *Dombrowski*, "a series of state criminal prosecutions will not provide satisfactory resolution of constitutional issues." *Id.* at 489, 85 S.Ct. 1116. The *Dombrowski* complaint alleged more than the injury incidental to any criminal proceeding brought in good faith.

Londono–Rivera argues that the collective action of the prosecutors and law enforcement officers constitutes bad faith, and further that the state prosecution was an attempt to circumvent the federal suppression ruling which in itself constitutes bad faith. Bad faith "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler*, 421 U.S. at 126 n. 6, 95 S.Ct. 1524. Stone, in bringing the state charges, appears to have had a reasonable expectation of obtaining a valid conviction because he researched his initial concern about double jeopardy, collateral estoppel, and Virginia Code Section 19.2–294 and whether a state prosecution could proceed. Thus, the circumstances suggesting that this case may rise to the level of an extraordinary circumstance warranting intervention do not appear also to suggest that the state prosecutor could not reasonably have expected to have obtained a valid conviction in State Court. Rather, they suggest that the Double Jeopardy Clause is implicated by the applicability of the collateral estoppel doctrine, which, depend-

ing on the facts of each case, can present an extraordinary circumstance.[6]

### b.  Extraordinary Circumstances

"There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment." *Younger*, 401 U.S. at 53, 91 S.Ct. 746. One example of an extraordinary circumstance is that "'a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it.'" *Id.* at 53–54, 91 S.Ct. 746 (citation omitted). That is not the case here. Another example later recognized by the Supreme Court was, in the civil context, when a State board was incompetent to adjudicate issues pending before it due to bias. *Kugler*, 421 U.S. at 125 n. 4, 95 S.Ct. 1524, citing *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488. That is also not the case here.

There is little precedent establishing what may constitute "other extraordinary circumstances." In *Younger*, the Supreme Court commented that "[o]ther unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify what they might be." *Younger*, 401 U.S. at 54, 91 S.Ct. 746. The Supreme Court later explained that, "whatever else is required, such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." *Kugler*, 421 U.S. at 125, 95 S.Ct. 1524.

---

**6.** Earlier in these proceedings, Petitioner eschewed any assertion that Stone acted in bad faith. Rather, his theory was that the Task Force officers and the United States Attorney so acted.

■ The Fourth Circuit and other courts of appeals have "unanimously recognized that a colorable claim that a second trial will violate a defendant's double jeopardy right is a preeminent example of one of the very few extraordinary circumstances justifying federal court intervention in a pending state criminal proceeding." *Gilliam v. Foster*, 75 F.3d 881, 904 (4th Cir.1996). A double jeopardy violation is an extraordinary circumstance because "the Double Jeopardy Clause of the Fifth Amendment protects not only against multiple convictions but also 'against being twice put to *trial* for the same offense,'" and therefore "a portion of the constitutional protection it affords would be irreparably lost if Petitioners were forced to endure the second trial before seeking to vindicate their constitutional rights at the federal level." *Id.* (citations omitted). As with harassing or bad faith prosecutions, double jeopardy rights cannot be vindicated on appeal.

Londono–Rivera was never put in jeopardy on the federal charges because the Federal Indictment was dismissed before jeopardy had attached. *Crist v. Bretz*, 437 U.S. 28, 35–38, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978); *United States v. Blackwell*, 900 F.2d 742, 745 (4th Cir.1990). However, the Supreme Court has held that collateral estoppel, "this established rule of federal law," applies in criminal cases and is embodied in the Fifth Amendment protection against double jeopardy. *Ashe*, 397 U.S. at 445, 90 S.Ct. 1189.

The Fourth Circuit has construed *Ashe* to be limited to its facts and has drawn a distinction between those cases in which the application of collateral estoppel would merely limit the proof that can be used in the second prosecution and those cases in which application of collateral estoppel would absolutely prevent a conviction, holding the issue is one of jeopardy if it would prevent conviction, but not if it would merely limit proof. *United States v. Head*, 697 F.2d 1200, 1205–6 (4th Cir. 1982). That distinction would not prevent the application of collateral estoppel in this case because all of the evidence against Londono–Rivera was suppressed and, therefore, application of collateral estoppel would prevent conviction. That rather obvious conclusion is underscored by the fact that the United States did not suggest, in the post-suppression hearing on the detention of Londono–Rivera, that it had any evidence against him other than that which was suppressed and by the fact that the United States abandoned prosecution after the suppression motion was granted.

■ Nor is the application of collateral estoppel limited to final dispositions. "Unlike the successive prosecutions prong of the double jeopardy protection . . . this aspect of the clause is implicated by the pretrial disposition of a prior case if an ultimate issue in the second prosecution was conclusively litigated and necessarily determined as part of the judgment entered in the first case." *Blackwell*, 900 F.2d at 745 (emphasis added).

The collateral estoppel doctrine, like the successive prosecutions concept, is embodied in the Fifth Amendment protection against double jeopardy.[7] The idea underlying the Fifth Amendment double jeopardy protection is that:

> the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subject-

---

7. The Second Circuit has suggested that the Due Process Clause, independent of the Double Jeopardy Clause, can require the application of collateral estoppel to protect criminal defendants from relitigation. *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1265–66 (2nd Cir.1975); *United States v. Davis*, 906 F.2d 829, 833 (2nd Cir.1990).

ing him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). In short, like the basis of collateral estoppel, the rationale of the double jeopardy protection is that the defendant should not be "forced to run the gantlet [sic]" more than once. *Id.* at 190, 78 S.Ct. 221; *see also United States v. Ragins*, 840 F.2d 1184, 1188 (4th Cir.1988); *Ashe*, 397 U.S. at 445–46, 90 S.Ct. 1189. Londono–Rivera is being forced to run the gauntlet of asserting his constitutional rights twice. And, the Task Force members, having "gone to school" in the federal case and having failed there on the first iteration of evidence to support the supposed consent to search, appear to have improved on their testimony on that topic in the State Court suppression hearing.

That, if true, is at odds with a central objective of the protection here at issue which is to provide:

> the barrier to "affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." Implicit in this is the thought that if the Government may reprosecute, it gains an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own.

*United States v. DiFrancesco*, 449 U.S. 117, 128, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980). In this case, the state prosecutor in the second prosecution unsurprisingly admits to having read this Court's opinion in the motion to suppress "many times." ⁵/₁₇ Tr. at 78. At the motion to suppress in the second prosecution, the prosecution presented the testimony of three witnesses that testified at the first motion to suppress and of one additional witness, Reverend Brooks. The second prosecutor was able to supply evidence that the first prosecutor failed to muster. And, the Task Force witnesses had an opportunity to hone their testimony so as to cast in a more favorable fashion the circumstances surrounding the asserted giving of consent.

■ The Supreme Court, of course, has held that, "at least in the absence of 'extraordinary circumstances[,]' federal courts must refuse to intervene in state criminal proceedings to suppress the use of evidence claimed to have been obtained through unlawful means." *Kugler*, 421 U.S. at 130, 95 S.Ct. 1524. However, those decisions do not involve efforts to address the constitutional issues presented when a federal court has first ruled that the Fourth Amendment has been violated. Under *Ashe, Blackwell* and *Gilliam*, a pretrial disposition that meets the requirements of collaterally estopping the use of evidence in a subsequent prosecution may very well present an "extraordinary circumstance" that permits a federal court to intervene in a state criminal proceeding under the *Younger* doctrine.

### B. The Anti–Injunction Act

■ In addition to satisfying the requirements of *Younger*, the petitioner, when seeking an injunction against state court proceedings, must comply with the Anti–Injunction Act, 28 U.S.C. § 2283, (Stay of State Court Proceedings), which provides:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

"On its face the . . . Act is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions." *Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 286, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). The statutory exceptions to the Anti–Injunction Act are narrow and should not be enlarged " 'by loose statutory construction.' " *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988). Although Londono–Rivera's motion indicates that he seeks a stay, the text of his papers clearly shows that he is seeking an injunction permanently foreclosing use of the evidence against him.

Londono–Rivera argues that the last exception, "to protect or effectuate its judgments," applies here. This exception, called the "relitigation exception," was "designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court. It is founded in the well-recognized concepts of res judicata and collateral estoppel." *Id.* at 147, 108 S.Ct. 1684. "[A]n essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." *Id.* at 148, 108 S.Ct. 1684.

■ "[M]ost federal courts have interpreted the [relitigation] exception far more narrowly than the doctrine of res judicata (which prohibits relitigation of all claims that were or could have been litigated in the earlier proceeding), and more akin to

collateral estoppel (which applies only to issues actually litigated)." 17 James Wm. Moore, *Moore's Federal Practice* § 121.08[2] (3d ed.). In the Fourth Circuit, the exception "applies, not only when the federal judgment is claim preclusive but also when collateral estoppel or issue preclusion applies." *Nationwide Mutual Insur. Co. v. Burke*, 897 F.2d 734, 737 (4th Cir.1990). The Fourth Circuit adheres to the "strict requirements" of the exception. *LCS Services, Inc. v. Hamrick*, 925 F.2d 745, 749 (4th Cir.1991). The exception is limited to "the precise language of the district court's prior order, and not to how the district court may have subsequently interpreted it." *Id.* at 750; *Atlantic Coast Line Railroad Co.*, 398 U.S. at 290, 90 S.Ct. 1739. The judgment need not be a final judgment. 17 James Wm. Moore, *Moore's Federal Practice* § 121.08[3] (3d ed.); *Sperry Rand Corp. v. Rothlein*, 288 F.2d 245, 248–49 (2nd Cir.1961).[8]

## C. Collateral Estoppel

Whether this case meets the requirements of both *Younger* and the Anti–Injunction Act depends on an analysis of the facts of this case under the collateral estoppel doctrine. Under the Anti–Injunction Act, to qualify for the relitigation exception the facts of the case must constitute collateral estoppel. Under *Younger*, the issue is whether collateral estoppel, if established, is an extraordinary circumstance.

■ The doctrine of collateral estoppel applies in criminal cases. *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Collateral estoppel

---

**8.** There appears to be "a disagreement among the circuits as to whether the relitigation exception applies only to final judgments." *Rutledge v. Scott Chotin, Inc.*, 972 F.2d 820, 824 (7th Cir.1992). However, even if the Fourth Circuit were to require a final judg-

ment, the relitigation exception could still apply here because the suppression issue was "fully and finally adjudicated" and the federal case was dismissed. *See Int'l Assoc. of Machinists & Aerospace Workers v. Nix*, 512 F.2d 125, 130 (5th Cir.1975).

"stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.*

■ Under both Virginia and Fourth Circuit law, the requirements of collateral estoppel are essentially the same and are the following: (1) the issue to be precluded is identical to the issue already litigated; (2) the issue was actually determined in the prior proceeding; (3) the determination of the issue was essential to the decision in the prior proceeding; (4) the prior judgment was final and valid; and (5) the party against whom estoppel is asserted was a party to or in privity with a party in the prior action and had a full and fair opportunity to litigate the issue. *Sedlack v. Braswell Services Group, Inc.,* 134 F.3d 219 (4th Cir.1998); *Nero v. Ferris,* 222 Va. 807, 284 S.E.2d 828, 831 (1981).

■ "Privity ordinarily involves 'a party so identical in interest with another that he represents the same legal right.'" *Angstadt v. Atlantic Mutual Insur. Co.,* 249 Va. 444, 457 S.E.2d 86, 87 (1995), citing *Nero,* 284 S.E.2d at 831. In Virginia, "a determination of just who are privies requires a careful examination into the circumstances of each case." *Nero,* 284 S.E.2d at 831.

■ In this case, the only facet of the collateral estoppel doctrine at issue is whether the parties are the same or in privity.[9] Under both Fourth Circuit and Virginia decisions, the test for privity is also the same: whether the interests of one party are so identified with the interests of another that representation by one party is representation of the other's legal right. *State Water Control Bd. v. Smithfield Foods, Inc.,* 542 S.E.2d 766, 769 n. 4 (Va.2001), citing *Andrews v. Daw,* 201 F.3d 521, 524–25 (4th Cir.2000) and *Dotson v. Harman,* 232 Va. 402, 350 S.E.2d 642, 644 (1986). Therefore, the determination of privity does not depend on the relationship between the parties in question but rather on the relationship of each to the interest of the other in the subject matter of the litigation.

The Fourth Circuit has held that, when the federal government was not a party to a state court action, collateral estoppel did not apply. *United States v. Safari,* 849 F.2d 891 (4th Cir.1988); *see also United States v. Smith,* 446 F.2d 200, 202 (4th Cir.1971) ("[t]he federal government is neither the same as nor in privity with the State of Virginia"). Those cases, however, did not have any of the facts that are present here which strongly suggest that the federal and state prosecutors and law enforcement officers were so closely identified with each other's interests as perhaps might permit a finding that they represent the same legal right. The Fourth Circuit's approach to the issue "flows from the Supreme Court's definition of collateral estoppel in *Ashe, supra,* and the Court's continuing endorsement of the dual sovereignty doctrine in related contexts." *United States v. Ricks,* 882 F.2d 885, 890 (4th Cir.1989) (citations omitted). Thus, the dual sovereignty doctrine is instructive in determining whether collateral estoppel applies in criminal cases.

The Supreme Court has recognized an exception to the dual sovereignty doctrine. It held that, when a prosecution is within

---

9. Neither party has argued the issue of mutuality, a requirement for application of collateral estoppel under Virginia law. *See Angstadt,* 457 S.E.2d at 87. Given the extensive nature of the parties' briefs on other aspects of collateral estoppel, the silence on this topic is construed to mean that neither party considers "mutuality" to be an issue.

the "discretionary responsibility" of the prosecuting officials there is no double jeopardy problem, but if one sovereign's prosecutors are "merely a tool" of the others, or a "sham and cover" for—and so "in essential fact" another prosecution by—the same sovereign, then the double jeopardy guarantee is implicated. *Bartkus v. Illinois*, 359 U.S. 121, 123, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). In the Fourth Circuit, the *Bartkus* "tool of the same authorities" exception (where the state is alleged to be the tool of federal authorities) "may only be established by proof that State officials had little or no independent volition in their proceedings." *In re Kunstler*, 914 F.2d 505, 517 (4th Cir.1990) (state officials instituted and controlled state proceeding so exception inapplicable).

The tests applied by other circuits to determine whether two prosecuting parties are the same or in privity for the application of collateral estoppel to criminal cases are instructive. For example, the First Circuit held that "a non-party to an action nonetheless may be bound by the issues decided there if it substantially controls, *or is represented by*, a party to the action." *United States v. Bonilla Romero*, 836 F.2d 39, 43 (1st Cir.1987) (emphasis added). In such cases, the two parties are so closely related that the party in the second case could be considered to have had his day in court. *Id.* The Ninth Circuit has held that "[t]he state would be bound by the prior determination only if state prosecutors had participated actively in the federal prosecution." *Stephens v. Attorney General of California*, 23 F.3d 248, 249 (9th Cir.1994). In the Second Circuit, a non-party can be bound "if it 'controls or substantially participates in the control of the presentation on behalf of a party.'" *Davis*, 906 F.2d at 833, citing *Restatement (Second) of Judgments* § 39 (1982).

In applying these tests, "the source of authority of two government entities is not dispositive of whether they are in privity." *Bonilla Romero*, 836 F.2d at 43. Nor is status as agents of one sovereign dispositive of privity. *Davis*, 906 F.2d at 834. The use of the same detectives as witnesses in each prosecution, where "the detectives did not have the authority to act in the state's name or to decide how the prosecution would proceed[,]" does not create privity. *Stephens*, 23 F.3d at 249. Other circuits have held that an agreement to prosecute by one sovereign with the expectation of substantial punishment is not, in itself, manipulation that implicates double jeopardy or due process. *United States v. Aboumoussallem*, 726 F.2d 906, 910 n. 3 (2nd Cir.1984), citing *United States v. Liddy*, 542 F.2d 76, 79 (D.C.Cir. 1976).

▮▮▮ The ability of officers to "choose to report their evidence initially to one prosecutor" does not create privity if the filing of charges "remains a sovereign decision within the discretionary authority" of each sovereign's prosecutor. *Davis*, 906 F.2d at 834. "Mere participation" in a prosecution is not enough to establish privity. *Id.* The level of participation and control may be measured by presence in the courtroom, providing assistance or advice, involvement with the prosecution and its decision not to appeal, and discussions between the two parties. *Id.; see also Bonilla Romero*, 836 F.2d at 44.

In this case, it would appear that the officers of the Task Force did much more than report evidence initially to the federal prosecutor. In fact, the Task Force officers, pursuing an official policy and practice in force since the Task Force was established in 1996, appear to have followed a course preordained by the Task Force policy and practice, but also sanctioned under a delegation recognized as

authoritative by the Commonwealth's Attorney for Henrico County. That appears to have been a state decision made by state officers pursuant to an official state policy long acquiesced by the Commonwealth's Attorney and by the United States Attorney because it was the purpose of the Task Force to enforce state drug laws.[10]

Moreover, it appears that the Task Force officers actually implemented that unified interest in this case by transferring custody of Londono–Rivera from the Commonwealth to the United States without even speaking to the United States Attorney. The Task Force representative from the DEA, relying solely on the enforcement activity described by other Task Force officers, all acting as state police, filed a criminal complaint in federal court. Task Force officers were not merely witnesses at the federal suppression hearing; Bonifant, a DEA agent who was a member of the Task Force, sat at the counsel table with the Assistant United States Attorney as the prosecutorial law enforcement representative.[11]

The evidence presented here might, as argued by Londono–Rivera, support a finding that, in bringing the case against Londono–Rivera in federal court, the United States was acting for, and on behalf of, the Commonwealth and its Task Force and in privity with the Commonwealth, accepting, pursuant to a longstanding policy and practice that preordained federal prosecution to further the state's interest, and then dismissing the federal case only after learning the state would continue the prosecution in state court. And, Londono–Rivera has presented a persuasive argument that the resulting need for Londono–Rivera to run the gauntlet in asserting his Fourth Amendment rights twice might be found to constitute an extraordinary circumstance under *Younger* and might be found to animate the relitigation exception.

### D. The Effect Of The Prior State Court Decision On Petitioner's Collateral Estoppel Motion

■■■ However, this Court cannot reach these issues because, even though the State Court appears not to have made a factual inquiry into the application of collateral estoppel to the federal suppression ruling, this Court cannot review that decision. Rather, this Court must examine the collateral estoppel effect of the State Court's ruling that the federal suppression decision did not have a preclusive effect in the State Court proceeding. That is because, in considering the relationship between the Anti–Injunction Act and the Full Faith and Credit Act,[12] the Supreme Court has:

> limit[ed] the relitigation exception of the Anti–Injunction Act to those situations

---

**10.** Conclusory testimonial assertions to the effect that each of the Task Force cases is considered separately and made the subject of separate decisions by the Commonwealth's Attorney and the United States Attorney might well be viewed with skepticism on this record.

**11.** Moreover, the Assistant United States Attorney provided legal advice to a State Task Force officer about the ability of the State to bring state charges against Londono–Rivera. The Assistant United States Attorney informed the office of the Commonwealth's Attorney of his concern about Londono–Rivera being re-leased and the need for the State to act quickly. The knowledge that the State was planning to bring charges was a factor in the decision of the United States not to appeal the federal suppression ruling.

**12.** The Full Faith and Credit Act provides that the judicial proceedings of any state court "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738.

in which the state court has not yet ruled on the merits of the res judicata issue. *Once the state court has finally rejected a claim of res judicata, then the Full Faith and Credit Act becomes applicable and federal courts* must turn to state law to determine the preclusive effect of the state court's decision. *Parsons Steel, Inc. v. First Alabama Bank,* 474 U.S. 518, 524, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986) (emphasis added). *Parsons Steel,* a decision not addressed by the parties' briefs even though it was previously directed to their attention by the Court, the Supreme Court held that the federal court "erred by refusing to consider the possible preclusive effect, under [state] law, of the state-court judgment. Even if the state court mistakenly rejected [the] claim of res judicata, this does not justify the highly intrusive remedy of a federal-court injunction against the enforcement of the state-court judgment." *Id.* at 525, 106 S.Ct. 768; *see also Swanson v. Faulkner,* 55 F.3d 956, 965 n. 8 (4th Cir.1995) ("*Parsons* requires that even an erroneous state court ruling concerning preclusion is entitled to full faith and credit.").

 As in *Parsons Steel,* if the State Court was mistaken in failing to give the Federal decision collateral estoppel effect, the proper way for Londono–Rivera to challenge the State Court's ruling on that point is by appeal through the State Court system and ultimately by petitioning for certiorari from the Supreme Court. *Parsons Steel,* 474 U.S. at 525, 106 S.Ct. 768. Londono–Rivera is collaterally estopped in this Court by the State Court's final decision on the same issue, which was decided between the same parties, the Commonwealth and Londono–Rivera.[13] Review of the State court's decision now must be pursued in the state court system, even though if the collateral estoppel issue had been first presented to this Court the effect of the federal suppression ruling could have been reversed by that Court.

## CONCLUSION

For the foregoing reasons, and on the procedural posture of this case, the Petition for Writ of Prohibition and Petition for Stay of State Court Proceedings must be denied and, thereupon, the action will be dismissed without prejudice to pressing the issues raised here in such a manner as is permitted by state law.

The Clerk is directed to send a copy of this Memorandum Opinion to call counsel of record by facsimile and regular mail.

It is so ORDERED.

---

**13.** Under the facts presented here, Londono–Rivera is actually asking this Court to review the State Court's collateral estoppel decision. Only one federal court, the Supreme Court of the United States may do that (except on habeas corpus). *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The Rooker–Feldman doctrine instructs that federal district courts are without jurisdiction to review state court decisions.